EATMAN v. EATMAN.†

(Court of Civil Appeals of Texas. Jan. 4, 1911.)

1. WITNESSES (§ 159*)—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS.
    Under Rev. St. 1895, art. 2302, prohibiting a party from testifying as to any transaction with a decedent, a wife seeking to recover on a mutual benefit certificate issued to her deceased husband, under an agreement that she should have the money on the certificate provided she paid the assessments, may testify as to the agreement as against the insurance order and a third person claiming as beneficiary.
    [Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 159.*]

2. INSURANCE (§ 783*) — FRATERNAL INSURANCE—AGREEMENTS TO PAY ASSESSMENTS—EFFECT.
    Where a husband holding a mutual benefit certificate agreed with his wife that, if she would pay the assessments, the money due on the certificate on his death should belong to her, and the wife paid the assessments and then stopped, the husband could after her ceasing to make payments change the beneficiary.
    [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1949 ; Dec. Dig. § 783.*]

3. INSURANCE (§ 783*)—FRATERNAL INSURANCE—AGREEMENTS TO PAY ASSESSMENTS—EFFECT.
    A husband holding a mutual benefit certificate agreed with his wife that, if she would pay the assessments, the money due on the certificate on his death should belong to her. She paid the assessments for a time, but later became unable to do so, and the local lodge then made payments in accordance with the constitution, providing that on any member in good standing becoming disabled the lodge might pay assessments. Held, that the wife ceasing to make payments lost her rights to prevent the husband from changing the beneficiary, though the lodge made payments which were for the benefit of the husband alone.
    [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1949 ; Dec. Dig. § 783.*]

4. EVIDENCE (§ 71*)—PRESUMPTIONS—MAILING AND DELIVERY OF MAILED MATTER.
    Testimony that an instrument addressed to one at San Antonio, Tex., was mailed at Sherman, Tex., on June 17th, justified the inference that the instrument reached San Antonio before the death of the addressee on June 19th.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 92 ; Dec. Dig. § 71.*]

5. INSURANCE (§ 784*)—FRATERNAL INSURANCE—CHANGE OF BENEFICIARIES—ISSUANCE OF NEW CERTIFICATE—ACCEPTANCE.
    Where a member of a fraternal insurance order applied for a change of beneficiary and for a new certificate, and the new certificate was mailed to him, his acceptance of it was unnecessary unless expressly prescribed as a condition to the taking effect of the new certificate, and the fact that the new certificate contained a blank for acceptance did not make acceptance essential.
    [Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1951–1954 ; Dec. Dig. § 784.*]

6. INSURANCE (§ 784*)—FRATERNAL INSURANCE—NEW CERTIFICATE—REQUIREMENTS.
    The by-laws of an insurance order, stipulating that the liability of the order on a certificate shall not begin until after the delivery of the certificate while the member is in good health, and providing for a change of beneficiary on written request and the payment of a fee whereon the order shall issue a new certificate subject to the same conditions as the original certificate, do not require the delivery of a new certificate changing the beneficiary while the member is in good health; such provision referring only to the original certificate.
    [Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1951–1954 ; Dec. Dig. § 784.*]

Error from District Court, Bexar County; Arthur W. Seeligson, Judge.

Action by R. J. Eatman against Cora Eatman and the Sovereign Camp of the Woodmen of the World, in which Cora Eatman filed a cross-petition against plaintiff and the Sovereign Camp. There was a judgment for plaintiff, and defendant Cora Eatman brings error. Affirmed.

W. A. Vinson and Clark & Bliss, for plaintiff in error. Joel A. Lipscomb, R. S. Cozby, and Bertrand & Arnold, for defendant in error.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes
† For opinion on motion for rehearing, see 135 S. W. 120c

JAMES, C. J. This is a writ of error taken from a judgment in favor of R. J. Eatman, rendered upon an instructed verdict; the action being by R. J. Eatman against Cora Eatman and the Sovereign Camp of the Woodmen of the World, upon a policy of in-, surance for the sum of $1,000 on the life of Wright D. Eatman, payable to R. J. Eatman as beneficiary. The judgment was that R. J. Eatman recover of the said Sovereign Camp $1,000, that Cora Eatman take nothing by her cross-action against R. J. Eatman or said Sovereign Camp, that her claim in and to the said insurance be adjudged invalid and not existing; that no interest or costs be adjudged against said Sovereign Camp, and that R. J. Eatman recover all costs of the proceeding against Cora Eatman.

The answer of Cora Eatman was a general denial and alleged that said Sovereign Camp issued a policy for $1,000 upon the life of her husband, Wright D. Eatman; that thereafter, owing to the fact that her husband fell into bad health and was unable to labor to support himself and her, it was agreed between him and her that the proceeds of her labor should become her separate property, and he donated to her all the proceeds of her labor, and he agreed that if she would labor and earn money and pay all the assessments and premiums on said policy the beneficiary, to wit, herself, should not be changed, but that said policy should become her separate property; that in accordance with said agreement she did labor and earn money and pay all the assessments, premiums, and dues on said policy to said Sovereign Camp up to and including December, 1907, when, owing to her disability, the local lodge of which her husband was a member, under the constitution and laws of the order, as was required by such constitution and laws, commenced and continued to pay said assessments up to and including May, 1908, when the plaintiff, R. J. Eatman, commenced paying and paid three, but she was in utter ignorance until after the death of her husband that the beneficiary in said policy had been changed or that the said R. J. Eatman was paying the assessments; that said Wright D. Eatman, being in extremely low health, left Sherman about May 1, 1908, for the benefit of his health, when he became worse and so feeble in health and mind that he was unable to resist the influence of any one near him; that said R. J. Eatman, having ascertained that her husband had said policy, and knowing that the latter had but a short time to live, and knowing his weak condition, formed the design to supplant her as beneficiary, and by use of his influence and persuasion induced him to change the beneficiary in said policy to himself, in order to obtain the benefit of the same and of the payments made by her; that this he procured to be done on June 15, 1908, and her husband died on June 20, 1908; that the allegations of R. J. Eatman that her husband died about June 19,

1908, and that at that time the policy was in full force, and that her husband was a member of the order in good standing, and that all assessments, etc., had been paid prior to her husband's death, were true, etc.; and prayed for a cancellation of all claims of R. J. Eatman in the policy, and that she have judgment against the order for the amount of the policy. The Sovereign Camp admitted its liability to pay the insurance.

The validity of the policy as changed to R. J. Eatman as the beneficiary depends upon the evidence relative to the agreement alleged by Cora Eatman between herself and the insured, laying aside a matter which she presents in her brief as a fundamental error, which will be dealt with in this opinion later.

The evidence relied on as proving the agreement consists wholly of testimony of Mrs. Eatman. We overrule appellee's cross-assignment of error complaining of the competency of her testimony as to conversations and transactions with her husband, for clearly the same did not come within the purview of article 2302, Rev. St. 1895. Her testimony on the subject was as follows, in substance: "I began paying the assessments in June, 1907, and kept them up to December, 1907. After this they were paid by the lodge. I made the money to pay said premiums and assessments by hard work in Sherman, by doing ironing, cooking, and sewing; also did washing. I did this because I had no other means of obtaining money, and Mr. Wright Eatman requested me to keep up payments. Mr. Wright Eatman said if I kept up the premiums I might have the benefit of the insurance in case anything happened to him." The witness Cora Eatman was asked the following question: "Was there or was there not anything said between you and the said Wright D. Eatman with reference to the beneficiary in said policy? If yea, what did he say about this? Please give his exact language as near as you can. Please state when and where said statement was made by the said Wright D. Eatman, or such conversation took place between you and him." To which she answered: "While living here in Sherman during May of last year, and also after we had moved to Choctaw, the first time he said he wanted me to keep up the payments because he was going to go away on railroading and he didn't know what was going to happen to him. The other time he talked to me about it was at Choctaw when he told me that he didn't think he would get well. The last time was in January, 1908, after the lodge had begun keeping up the payments. He had been talking about the lodge being so good to him." The witness Cora Eatman was then asked the following question: "Was there or was there not anything said between you and the said Wright D. Eatman with reference to the proceeds of your labor as to whether or not they were to remain community property or to become your separate property? If yea, please state just what

was said on this matter, when and where such conversation took place, and how often." To which she replied: "He told me when he left to go to the railroad work that he was going to be away and could not attend to the matter and wanted me to look after it and that I should have the benefit of my paying the premium. He said he wanted me to have the insurance as my money. This conversation was had in Sherman, and he frequently spoke of the matter. I cannot remember how often." It is claimed by appellee that the above evidence fails to show an agreement on the part of Wright Eatman as alleged.

From the view we take of the case, these questions are not material. Conceding that it was sufficient to show the agreement, the undisputed evidence and her admissions show that she did not keep up the assessments, but that she stopped paying same several months before the death of her husband. As stated in Masonic Mutual Ben. Ass'n v. Tolles, 70 Conn. 543, 40 Atl. 450: "Giving to the arrangement which was made between Eulie, his father, his mother, and his brother, the construction most favorable to him, and even calling it a contract, there was in it the necessary condition that the payments should be kept up so long as Daniel B. Tolles lived. This contract, if it may be so called, was upon the consideration of paying the assessments and other moneys necessary to keep alive the membership of the said Daniel B. Tolles in said association. And when Eulie failed, during the lifetime of Daniel, to continue these payments, he failed to perform the consideration on which alone his right to share in the $2,000 depended."

In Hill v. Hill, 130 Ill. App. 278, it was held that a beneficiary, who has assisted in the keeping up of insurance under an agreement by which the proceeds thereof, or a part of them, are to be paid to her, loses such rights when she abandons such agreement and fails to perform her undertakings.

According to the arrangement testified to by Mrs. Eatman, its effect, if it amounted to a contract, was to cut her husband off from his right to change the beneficiary from her to another, provided she kept up the payments during his lifetime.

It has been repeatedly held that where, under such an agreement, the payments were continued until further payment by the beneficiary was rendered impossible by the unauthorized cancellation of the certificate, or by the refusal of the order to receive further payments from the beneficiary, her right to the insurance under the agreement would not be lost by a change in the beneficiary. Grand Lodge v. Denzer, 129 Ky. 202, 110 S. W. 883; King v. Supreme Council, 216 Pa. 553, 65 Atl. 1108.

In this instance the wife stopped making the payments for inability about five months before her husband undertook to change the

policy from her to his brother, the effect of which was to reinstate her husband's right to substitute another as the beneficiary.

It is insisted, however, that she, in effect, kept up the payments, by procuring the lodge, of which her husband was a member, to do so. The facts as to this are substantially these:

The constitution of the order provides: "If any member in good standing becomes sick, disabled or impoverished to such an extent that he requires care, attention and assistance, on notification thereof, the consul commander and clerk shall have authority to draw a warrant on the general fund for an amount sufficient to provide proper care for such member until the next regular meeting of the camp, at which time a report shall be rendered the camp and such action taken as the camp may determine."

The clerk of the camp testified: "Cora Eatman paid the premiums and assessments up to December, 1907. She had been paying them for about a year before his death or more. The camp began paying them in December, 1907, and kept them up to May, 1908. R. J. Eatman paid three assessments, May, June, and July, 1908. The reason why the camp paid the dues was because the rules and regulations of the W. O. W. required it where a member is sick or disabled." He testified also that the above-copied provision is the authority the lodge acted upon. The matter of payment of Wright D. Eatman's dues was brought before the lodge and he was instructed to pay same.

Cora Eatman testified: "I began paying the assessments in June, 1907, and kept them up to December, 1907. After this time they were paid by the lodge. * * * The reason I quit paying was because I had no money to pay with, and the clerk of the lodge Mr. C. P. Gregory, told me that the lodge would attend to it, and I trusted him to do so, which I understood they did."

The agreement (if any) between the husband and wife gave her no vested right in the certificate until his death. As between the order and Wright D. Eatman, the latter's power to change the beneficiary existed at all times; but as to the wife the agreement would have the effect, in equity, of estopping him from changing the beneficiary, so long as she complied with the agreement by keeping up the payments, and no longer. She admits she failed, by reason of inability, to keep up the payments, and stopped doing so several months before her husband undertook to make the change. Her inability was no excuse and deprived her of all equity she might have had under the agreement.

Quoting from Fischer v. Fischer, 99 Tenn. 637, 42 S. W. 450: "But, under the findings of the Court of Chancery Appeals, the son was unable to carry out his agreement to maintain his father, not from a desire to do so, but from necessity. It also finds that the sister attempted to exercise no improper in-

fluence over her father, and that he made the change of his own volition, and she was guilty of no fraud in relation to it, and that the father comprehended the nature and purport of his action in changing the certificate. This state of facts does not raise any equity upon the part of the brother to have the fund distributed upon any· different basis, or in any manner different from that provided in the final certificate."

It seems perfectly clear to our minds that the wife's right to claim a suspension of the insured's power to appoint a new beneficiary terminated when she failed to make the payments according to the agreement she alleged and testified to.

Was the keeping up of the payments by the lodge of which Wright D. Eatman was a member a substantial performance by her of her agreement? We think she might have induced a third person to make the payments, which her inability prevented her from making, by contract express or implied to repay such person, or even by inducing the payments to be made through purely charitable motives by another in her behalf. The payments made by the lodge were not a matter of charity to her, but to her husband, the member. They were made in his behalf, under existing provisions that related to his membership, which, in case of his inability to pay dues and assessments, and not the beneficiary's, enabled the lodge, in a case in which it deemed it proper, to extend relief to the member. The fact that she may have informed the lodge of the conditions which led to the action of the lodge, and the fact that the clerk informed her that the lodge would pay the same, and that she relied on its doing so, makes no difference. What she did was to quit and turn the matter of payments over to the lodge, under its regulations, instead of providing for them herself. Her status is not any different from what it would have been had Wright D. Eatman, on account of her inability to continue the payments under the contract, and his own, invoked the protection of his certificate contemplated by the regulations. In that case it would seem clear that her right under the contract she claims would then and there have terminated. The lodge would have acted in the matter, however informed, or might have acted upon its own motion.

Hence we conclude that the agreement constituted no obstruction to Eatman's appointment of his brother as the beneficiary, at the time he undertook to do so, and furthermore that she has no equities that she can assert from what she had done in pursuance of the agreement.

Plaintiff in error urges that there is an error, fundamental in its nature, in this, that R. J. Eatman failed not only to prove compliance with one of the conditions precedent to the payment of benefits under the certificate under which he claims, viz., the condition that said certificate must have been delivered to Wright D. Eatman in person while in good health, but the testimony showing with reasonable certainty that said certificate was never delivered to Wright D. Eatman in person, the original certificate in favor of Cora Eatman remained in force, or at least there is no liability of the Sovereign Camp under the certificate under which R. J. Eatman claims. She relies for the above proposition upon the following of the by-laws of the order, in connection with the following facts: That the only evidence of the final certificate's delivery to Wright D. Eatman was that it was received from the Sovereign Lodge by the clerk of the local lodge at Sherman who had it properly signed, put the seal of the camp on it, recorded it, and then mailed it to San Antonio to Wright D. Eatman, the insured. The signing by the clerk, who forwarded it, took place on June 17, 1908. The clerk testified that about two days after he mailed it he received a telegram from San Antonio that Wright D. Eatman was dead. Wright D. Eatman died on the 19th of June, 1908. The above testimony indicates that the mailing was on the 17th. Upon this testimony no other inference is reasonable than that it reached San Antonio from Sherman and reached Eatman before his death.

The by-laws cited by plaintiff in error are: "Sec. 58. The liability of the Sovereign Camp for the payment of benefits on the death of a member shall not begin until after his application shall have been accepted by a Sovereign physician, his certificate issued, and he shall have * * * (5) had delivered to him, in person, his beneficiary certificate while in good health."

Section 59 of said by-laws is as follows: "Sec. 59. The noncompliance with any of the several conditions precedent named in these laws shall be an absolute bar to any claim on the beneficiary fund of the order, under or by virtue of any beneficiary certificate that may have been issued or that may hereafter be issued to an applicant or by reason of any steps taken by an applicant to entitle him to the same, or by a subordinate camp, or member thereof, and no deputy, officer or member of the Sovereign Camp has any authority to change, alter, modify or waive the foregoing requirements, or the consequence in any manner.

· "Sec. 60. The following conditions shall be made a part of every beneficiary certificate and shall be binding on both member and order: Third. There shall be no liability of the Sovereign Camp of the Woodmen of the World under this certificate until the member named herein shall have paid all entrance fees, one advance assessment of Sovereign Camp fund and camp general fund dues for the month; paid the physician's fees for examination, been obligated or introduced by a camp or authorized deputy in due form and had delivered to him, in per-

son, this beneficiary certificate, while in good health. The foregoing provisions are hereby made a part of the considerations for and are conditions precedent to the payment under this certificate."

Section 64 of said by-laws is as follows: "Should a member desire to change his beneficiary or beneficiaries, he may do so upon payment to the Sovereign Camp of a fee of twenty-five cents, which sum together with his certificate he shall forward to the sovereign clerk with his request written on the back of his certificate, giving the name or names of such new beneficiary or beneficiaries, and upon receipt thereof the sovereign clerk shall issue and return a new certificate subject to the same conditions and rate as the one surrendered, which conditions shall be a part of the new certificate, in which he shall write the name or names of the new beneficiary or beneficiaries and shall record said change in the proper books of the Sovereign Camp."

The certificate under which R. J. Eatman claims contains the following:

"This certificate is issued and accepted subject to all of the conditions on the back hereof and subject to all the laws, rules and regulations of this fraternity now in force or that may hereafter be enacted, and shall be null and void if said Sovereign does not comply with all of said conditions and with all of the laws, rules and regulations of the Sovereign Camp of the Woodmen of the World, that are now in force or which may hereafter be enacted and with the by-laws of the camp of which he is a member. Issued in lieu of certificate dated Apr. 13th, A. D. 1903. May 28th, A. D. 1907."

On the back of said certificate the conditions are printed, among which is the following:

"'(3) There shall be no liability of the Sovereign Camp of the Woodmen of the World under this certificate until the member named herein shall have paid all entrance fees, paid one advance assessment of Sovereign Camp fund assessments and camp general fund dues for one month, paid the physician's fee for medical examination, been obligated or introduced by a camp or authorized deputy in due form and had delivered to him in person this beneficiary certificate while in good health. The foregoing provisions are hereby made a part of the consideration for and are conditions precedent to the payment of benefits under this certificate."

In the face of said certificate the following appears:

"I have read the above certificate No. 82902 of the Sovereign Camp of the Woodmen of the World and the conditions hereon and hereby agree to and accept the same as a member of Camp No. 9, State of Texas, this 17th day of June, 1908, and warrant that I am in good health at this time and that all the requirements of section 58 of the constitution and laws of the order have been complied with.

"............................
[Member sign here.]

"Witness: C. P. Gregory, Clerk of Camp."

*This was not signed by* Wright D. Eatman.

The other point made, in this connection, is that Wright D. Eatman was not shown to have accepted the certificate sued on while in good health, and therefore it never took effect as a certificate. Having applied for the change of beneficiary and for a new certificate to another as beneficiary, and the new certificate having been completed by the order and mailed to him, his acceptance of it should be taken for granted, or rather is unnecessary, where particular formalities as to acceptance are not expressly prescribed as conditions to its taking effect. If there is anything in the above by-laws requiring an acceptance of the insured by indorsement on the certificate, as a condition to its taking effect, we have failed to discover it. See Sovereign Camp v. Brown, 88 S. W. 375. It is true there is a blank upon the policy designed for this purpose, but plaintiff in error cites no provision of by-law or otherwise which provides for this. It was evidently the customary practice in order to evidence acceptance, but it was not indispensable. Evidently Wright D. Eatman was in extremis at the time the certificate presumably reached San Antonio by ordinary course of mail. Everything was done which was required by the rules of the order to change the beneficiary and the certificate itself finally mailed to Eatman before he died. Indeed, it may well be said, as stated in Wandell v. Mystic Toilers, 130 Iowa, 639, 105 N. W. 451, and cases there cited, that, where the insured has done everything necessary under the rules to that end, the ministerial act of issuing a new certificate is not material to the rights of the new beneficiary. Here the certificate was actually issued to him before his death.

We are of opinion that the by-laws, in so far as they refer to the insured being in good health, have reference only to original insurance.

We are also of opinion that acceptance written upon the certificate was not required nor essential; that, when this certificate was forwarded to the insured, it was complete and effectual as the contract of insurance.

We are further of opinion that the questions of the wife's earnings having become her separate property, and of the certificate being her separate property, are immaterial.

Judgment affirmed.